**TOTAL PETROLEUM, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 439–85L.

United States Claims Court.

April 17, 1987.

Howard E. O'Leary, Washington, D.C., attorney of record, for plaintiff. I. David Rosenstein and Dykema, Gossett, Spencer, Goodnow & Trigg, Washington, D.C., of counsel.

David E. Dearing, with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Plaintiff is the owner and operator of a crude oil gathering and pipeline transportation system located in southern Oklahoma and northern Texas. In the fall of 1984, floodwaters led to the rupture of one of plaintiff's gathering lines, causing oil to spill into a creek. In this suit, brought here under 33 U.S.C. § 1321(i)(1) (1982), plaintiff seeks to recover the costs it incurred to clean-up the spill, claiming that the discharge was caused solely by an act of God. The Government denies plaintiff's claimed entitlement. The issue is presented to the court on cross-motions for summary judgment. Briefs have been filed, and oral argument has been heard. We conclude that defendant is entitled to judgment as a matter of law.

### Facts

The discharge in question involved approximately 1,000 barrels of crude oil that spilled from one of plaintiff's pipelines during an unusually heavy flood on the Caddo Creek in southern Oklahoma. The floodwaters carried the oil slick downstream into the Washita River, thence through the Tishomingo National Wildlife Refuge, and eventually into Lake Texoma on the Texas-Oklahoma border. Waterfowl habitat and vegetation were damaged along the way.

The Caddo Creek is criss-crossed at various points by some 225 pipelines owned by a number of oil companies. Although some of these lines are buried beneath the channel, most extend above the surface of the creek. Plaintiff's pipeline was of the latter variety.

The pipeline, known in the industry as a "gathering line", was part of a 500-mile crude oil gathering and pipeline transportation network owned and operated by plaintiff. Constructed in 1921, the gathering line, which was four inches in diameter, was used to pump crude oil from a nearby drilling field into a larger main line, which then carried the oil to a refinery. The gathering line spanned Caddo Creek at a height of one foot above the water surface. Along the line of crossing, the creek measured 30 to 40 feet in width and 10 feet in depth. The pipeline was held up on each bank by a support, called an "H-brace", located 12 feet inward from the water line.

In late October 1984, heavy rains caused Caddo Creek to flood and overflow its banks. At about 8:30 a.m. on October 27, Clinton A. Owens, plaintiff's local district maintenance manager, received a telephone call advising him that oil had been seen in the creek in the vicinity of plaintiff's pipeline. Upon inspection, Mr. Owens discovered that the leak was coming from an upstream pipeline owned by Mobil Oil Corporation. The spill from that pipeline is not connected with this suit.

At about noon the same day, Mr. Owens again checked plaintiff's pipeline. At that time, he found that the line was submerged, but he saw no debris accumulated against it. Mr. Owens also checked for erosion on the channel banks and found there was no immediate danger to the two H-brace supports. Mr. Owens, who is 38 and a lifelong resident of the area, also stated that he had seen Caddo Creek flood

its banks on 10 or 12 occasions, but had never before seen the pipeline submerged.

The following morning, Mr. Owens received a second telephone call, again reporting that more oil had been seen near plaintiff's pipeline. Upon inspection at about 8:00 a.m., Mr. Owens found that one of the H-braces supporting the pipeline had been washed away along with part of the east bank of the creek. Oil was now pouring from a rupture in the pipeline and mixing with the spill from the Mobil pipeline.

Although no one actually witnessed the pipeline rupture, it is certain that the spill was caused by the collapse of the H-brace on the east bank. The evidence indicates that as long as the H-braces were in place, the flood posed no special danger to the pipeline. This was so because the pipeline was suspended a foot above the channel. The creek therefore would have to overflow its banks before the floodwaters could reach it. However, when this overflowing occurred, the velocity of the current would diminish. Thus, any debris, such as uprooted trees, would normally drift slowly into the pipeline and accumulate there without causing any damage. Then, when the floodwaters subsided and the creek returned to its usual channel, the current would, in turn, speed up again. Because the pipeline was rigid, the force of the moving water would be expected to pull the debris harmlessly underneath the pipeline and safely downstream.

According to the evidence, however, the following sequence of events took place subsequent to Mr. Owens' inspection at noon on October 27: A large uprooted tree floated downstream, and its roots became entangled with the pipeline. Then, as the flooding continued, the current undermined and washed away about 20 feet of embankment along the east shore of the creek. The H-brace was swept away as well. Without this shoreline support, the pipeline lost its rigidity and sagged deeper in the water.

Later, when the floodwaters subsided and the creek was restored to its normal boundaries, the current velocity increased. However, the tree roots did not snap off against the pipeline, as they normally would be expected to do under the force of the moving water. Instead, they remained ensnarled with the pipeline. As the force from the current increased, the line began to bend under the weight of the tree, much like a wishbone. Eventually, the bending unearthed a portion of the pipeline that was buried inland on the east side of the creek. At a point about 40 feet from where the original channel bank had been, the ground refused to yield any further, and the pipeline snapped.

Mr. Owens reported the spill to his superiors, and the oil flow was finally shut off. However, more than 1,000 barrels of oil escaped into the creek. Plaintiff worked for some two weeks with Mobil employees to clean-up the combined spill from their two pipelines. Plaintiff brings suit here seeking to recover its clean-up expenses on grounds that the spill was caused solely by an "act of God", *i.e.*, the flood.

### Discussion

■ Section 311 of the Federal Water Pollution Control Act Amendments (later renamed the Clean Water Act), *as amended*, 33 U.S.C. § 1321 (1982), declares that "it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States". § 1321(b)(1). Accordingly, under most circumstances, a discharger is strictly liable for clean-up costs within certain monetary limits. §§ 1321(c), (f).

■ But this liability scheme is not absolute. A discharger may recover clean-up expenses from the Government if it can prove that the spill was "caused solely by" an act of God, an act of war, the negligence of the Government or the acts of a third party. § 1321(i)(1). These exceptions must, however, be narrowly construed. As the accompanying Senate Report stated, "Any culpability on the part of the owner or operator would vitiate the exception." S.Rep. No. 351, 91st Cong., 1st Sess. 6

(1969).[1] Plaintiff therefore bears a heavy burden of proving it was totally without fault for the spill. *St. Paul Fire & Marine Insurance Co. v. United States*, 4 Cl.Ct. 762, 768 (1984); *Atlantic Richfield Co. v. United States*, 1 Cl.Ct. 261, 263 (1982).

In an effort to show that plaintiff was not totally without fault for the Caddo Creek spill, the Government raises a number of arguments. These include contentions that (i) the flood on Caddo Creek was not an "act of God" within the meaning of § 1321(a)(12); (ii) that reasonable care dictated that the pipeline should have been buried below the bed of the creek or that the H-braces should have been located beyond the 100–year high-water mark; and, finally, (iii) that plaintiff affirmatively contributed to the spill by pumping oil through the pipeline during the flood. The analysis we pursue here begins and ends with the last of the Government's arguments.

In *Cities Service Pipe Line Co. v. United States*, 742 F.2d 626 (Fed.Cir.1984), the Federal Circuit held that the mere act of pumping oil through a pipeline, "which is not abnormally dangerous", does not preclude recovery of clean-up costs; there must also be a breach of care on the part of the discharger. *Id.* at 627; *see also Travelers Indemnity Co. v. United States*, 230 Ct.Cl. 867, 869, *cert. denied*, 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982) (mere act of placing oil in storage tank does not preclude recovery). Mindful of this case authority, defendant argues that even if, under normal conditions, the act of pumping oil is not an affirmative act that precludes recovery, in this instance continuing to pump oil during a flood was an abnormally dangerous activity that contributed to the spill. And, hence, says defendant, the flood cannot be considered—as recovery under § 311 demands it must—the *sole cause* of the discharge.

■ As the court sees it, the determination of whether plaintiff's pumping of oil falls within the definition of "abnormally dangerous activity" invokes the same basic analysis as the determination of whether plaintiff exercised reasonable care. The term "abnormally dangerous", as used in *Cities Service*, obviously is borrowed from the common law doctrine that imposes strict liability in tort for abnormally dangerous activities. *See Restatement (Second) of Torts* § 519 at 34 (1977).

■ Under the *Restatement* test, determining whether an activity is abnormally dangerous requires a balancing of such factors as the risks of harm, the magnitude of potential harm, the ability to eliminate the risk in the exercise of reasonable care, common industry practices, the appropriateness of the location of the activity, and the extent to which the benefits of the activity to the community outweigh the dangers. *Id.* § 520 at 36. These are the same cost vs. benefit factors that are traditionally used in tort law to determine whether a party has exercised due care. *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1026 (7th Cir.1982) (Posner, J.); *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (Hand, J.); *see also* W. Prosser & W. Keeton, *Prosser & Keeton on Torts* § 31 at 172–73 (1984); Posner, *A Theory of Negligence*, 1 J. Legal Studies 29 (1972). Thus, even though the "abnormally dangerous activity" doctrine is couched in the language of strict liability, determining when to apply the doctrine essentially turns on "considerations seemingly bearing on the activity's reasonableness or negligence". Schwartz, *The Vitality of Negligence and the Ethics of Strict Liability*, 15 Ga.L.Rev. 963, 970 (1981).

In short, the argument that continued pumping of oil during the flood was abnormally dangerous activity is simply another way of saying that plaintiff failed to exercise the precaution of shutting off the flow of oil when it reasonably should have been aware of a potential danger to the pipeline. Hence, the failure to shut off the flow would breach plaintiff's duty of care. It is

---

1. Report of the Senate Committee on Public Works accompanying S. 7, the predecessor of the Federal Water Pollution Control Act Amendments. *See Reliance Insurance Co. v. United States*, 230 Ct.Cl. 390, 398 n. 8, 677 F.2d 844, 849 n. 8 (1982).

from that analytical standpoint that the court addresses defendant's argument.

■■■ The operation of an oil pipeline, like any commercial activity related to the handling of oil or hazardous materials, imposes upon the operator a duty to exercise "reasonable care" to prevent spills. *Cities Service*, 742 F.2d at 628 n. 1; *see also Travelers Indemnity*, 230 Ct.Cl. at 869; *Union Petroleum v. United States*, 228 Ct.Cl. 54, 73, 651 F.2d 734, 745 (1981); *Chicago, Milwaukee, St. Paul & Pacific Railroad v. United States*, 216 Ct.Cl. 155, 159, 575 F.2d 839, 841 (1978). In determining what precautions are reasonably required for the safe transportation and storage of oil, standard industry practices are one useful guide. *Travelers Indemnity*, 230 Ct.Cl. at 869. Moreover, when the discharger itself recognizes the need for commonly used spill prevention measures but fails to employ them in a reasonably diligent fashion, its omissions constitute negligence *per se*. Thus, in *Travelers Insurance Co. v. United States*, 2 Cl.Ct. 758 (1983), the failure to keep a spill containment wall in good repair precluded recovery of clean-up costs. *Id.* at 762–63. Similarly, in *Atlantic Richfield*, the plaintiff's failure to park an oil truck within a secured spill containment area precluded recovery. 1 Cl.Ct. at 263–64.

In this case, both parties agree that a bulletin published by the American Petroleum Institute, entitled *API Recommended Onshore Production Operating Practices For The Protection Of The Environment* (May 1982), is an authoritative source of standard safety practices in the construction and operation of oil pipelines. The bulletin advises oil companies to take various environmental factors into account when designing pipelines, including the proximity to streams, possibility of underground construction, etc. *See generally* §§ 3.1–3.24 at 6–7. With reference to natural disasters specifically, § 5.2(d) of the manual recommends the following:

Develop contingency and shut-down plans for coping with hurricanes and other natural disasters so as to minimize the potential for oil discharges or incidents causing pollution or other environmental damage. [*Id.* at 12.]

In addition, § 5.2(c) of the bulletin urges oil companies to develop training programs to keep employees well versed in spill prevention techniques. *Id.*

Consistent with those recommendations, plaintiff's policy—as explained in the affidavit of the general manager of its southwest division—is to conduct regular aerial inspections of its pipelines. During floods, employees are further required to "continually monitor" the condition of pipelines, through on-the-spot inspections if possible. According to plaintiff, employees are instructed to check both for debris collected on the pipeline and for erosion that might endanger the braces supporting the pipelines. To further quote the affidavit: "Total's employees are instructed to check all of the pertinent facilities at least twice a day until the creek or river returns to its normal condition." If a potentially dangerous situation is discovered, employees are instructed to contact a supervisor, who has authority to order oil pumping shut-down.

This court has no difficulty with the general proposition that it is reasonable for an oil company to construct its pipelines to withstand everyday environmental wear and tear, and then rely upon a stand-by shut-off procedure to deal with extreme weather conditions, such as severe floods. But in carrying out that preventive policy, it is imperative that the company diligently monitor dangerous flood conditions, so as to ensure that pumping is shut off well in advance of a potential disaster. As the Federal Circuit has noted, a plaintiff's pipeline inspection program must be "reasonably calculated to detect such damage that it knew was likely to occur and in fact did occur." *Cities Service*, 742 F.2d at 628.

■■■ On the facts in this case, it is inconceivable that a monitoring effort reasonably calculated to detect erosion from the known flood conditions on the Caddo Creek would have failed to reveal the danger to the H-braces long before the pipeline finally ruptured. There is no explanation—and as the court sees it, no excuse—for plaintiff's maintenance manager to have waited

some 20 hours before returning to inspect the condition of the pipeline (and only then in response to a telephone call from another oil company). When Mr. Owens observed the pipeline at noon on October 27, the floodwaters were already higher than he had ever seen them. Furthermore, he stated in his second declaration that he was aware of the possible threat of erosion and checked to see that the H-braces were not in danger. Even assuming the condition of the east bank at that time did not warrant a shut-down of pumping, there is no evidence in the record to suggest that Mr. Owens had any reason to believe the situation might not get worse—which in fact it did. The need for continuous monitoring was obvious. Under the circumstances, it is impossible to conclude that plaintiff took all reasonable precautions to prevent the oil spill, when in fact it failed to follow its own monitoring procedures in a responsible manner.

■ Where a plaintiff fails to exercise reasonable care to prevent an oil spill, it can recover clean-up costs only if it can establish that its omission was "so indirect or insubstantial as not to constitute a contributing cause of the spill". *Travelers Indemnity*, 230 Ct.Cl. at 869. No case for such an excuse is made here.

Furthermore, the evidence clearly establishes otherwise. At the time of the spill, the pipeline was carrying oil across the creek at a rate of 200 barrels an hour, and 1,000 barrels were discharged after the pipeline ruptured. Thus, with no more— and possibly much less—than five hours warning, the flow of oil could have been shut off so as to prevent virtually any discharge. Had plaintiff conducted a continuous inspection of the flooding situation adequate to the circumstances, there is no reason why the oil flow could not have been shut off well before the spill began. Therefore, the failure to shut off the flow was a substantial cause of the spill.

The only evidence in the record that could support a contrary result is a conclusory entry on a spill report form prepared on November 16, 1984 by a consulting company hired by the Environmental Protec-

tion Agency. Question 13(a.) on the form asks: "Could the discharge have been prevented using reasonable care?" The word "Yes" appears typed in the answer blank. It is crossed out, however, and the word "No" is handwritten in the blank, along with the initials of the geologist who prepared the report and the notation "1/21/85".

■ There is no evidence in the record explaining why this change was made or the reasoning behind the entry. Insofar as this finding is unexplained, conflicts with all other evidence in the record and represents a conclusion of law, it is entitled to no weight. *See Atlantic Richfield*, 1 Cl.Ct. at 264 (Coast Guard finding that discharger took adequate precautions is not controlling on issue of reasonable care). A party cannot defeat summary judgment on the basis of an expert opinion that fails to state specific facts that support the expert's conclusion. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985); *United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700–01 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C.Cir.1977); *see generally Fehrs v. United States*, 223 Ct.Cl. 488, 508, 620 F.2d 255, 265 (1980) (opinions of experts can be no better than reasons that support them).

## CONCLUSION

An inspection adequate to the circumstances would have alerted plaintiff to the peril of erosion on the east bank long before the situation posed a critical danger to the pipeline. Thus, if it had exercised reasonable care, plaintiff clearly would have been in a position to prevent the spill by shutting off the flow of oil. Because plaintiff breached its duty of care, and because that breach directly contributed to the spill, the flood cannot be viewed as the sole cause of the discharge. Therefore, plaintiff is precluded from recovery under 33 U.S.C. § 1321(i)(1).

For the reasons stated, defendant's motion for summary judgment is granted, and

plaintiff's motion for summary judgment is denied. The complaint shall be dismissed.