STUART, Justice
(dissenting).
J. Gregory Carwie, conservator for Emil Harris, sued Peter Knudsen A/S (“Knudsen”) in the Mobile Circuit Court, seeking damages for injuries Harris suffered in a *207 fall while performing repairs on the M/V Vinland Saga, a Knudsen-owned cargo ship, while it was in drydock at a shipyard in Mobile, Harrison Brothers Drydock & Repair Yard, Inc. The majority affirms the judgment in favor of Knudsen; however, for the reasons that follow I respectfully dissent.
The United States District Court for the Southern District of Alabama provided the following general background for this case in In re Peter Knudsen A/S, 710 F.Supp.2d 1252, 1256 (S.D.Ala.2010):
“At all times relevant hereto, Knudsen, a Danish corporation, owned the M/V Vinland SAGA, which is a Danish general cargo vessel. This vessel has two working cargo holds, Number One Hold forward and Number Two Hold aft, which were separated into two decks, a lower hold and a ‘tween deck.’ In order to enter Number One Hold from the weather deck/main deck, access must be made through an opening on the main/weather deck. In order to travel from the main/weather deck to the bottom of the cargo hold, a person would need to descend an access ladder via a small opening or hatch cover on the main deck. The ladder from the main deck stopped at the ‘tween deck’ which consisted of a ledge or ‘catwalk’ running around the perimeter of the hold. The ‘tween deck’ was approximately seven feet from the bottom (tank top) of the hold and about four feet wide. The ‘tween deck’ was comprised of metal plates which could be opened to allow full use of the cargo hold, i.e. from the bottom of the cargo hold (sometimes referred to as the ‘tank top’) all the way to the main hatch covers on the weather/main deck. If the ‘tween deck’s’ floor plates were removed, the ledge or catwalk was open to the bottom of the cargo hold or tank top. After climbing down the access ladder from the main deck to the ‘tween deck,’ a person would have to walk a few feet forward and descend a second ladder to the bottom or tank top.
“In early March 2006, the Vinland SAGA loaded a cargo of heavy anchor chains in Bilbao, Spain. When the anchor chain was loaded in Bilbao, the ‘tween decks’ were open allowing the chain to fill up most of the cargo hold. John Sorenson and Captain Hovgaard were the captains and John Andreassen was the chief engineer aboard the vessel during the voyage from Bilbao. Captain Sorenson testified that the crew put lashings to secure the ‘tween deck’ plates in place prior to the sea voyage from Bilbao to the United States. In route to Port Forchon, the Vinland SAGA suffered a breakdown in its propulsion system near the Bahamas. After being towed several times, the vessel ultimately arrived in Mobile, Alabama.”
(Capitalization in original; citations to record omitted.) The M/V Vinland Saga arrived at the Harrison Brothers shipyard in Mobile on August 21, 2006. Harrison Brothers personnel and the ship’s officers then jointly inspected the ship to survey the work that needed to be completed, and, on August 30, 2006, the M/V Vinland Saga was moved to drydock so that repairs could begin.
The M/V Vinland Saga’s six-man crew remained onboard the ship while it was in drydock undergoing repair; the crew was actively engaged in performing separate repairs during this time. The crew did not work on the same projects as did shipyard personnel; however, it is undisputed that both the ship’s crew and shipyard personnel had projects in both of the ship’s cargo holds. On September 28, 2006, Harris, a pipefitter by trade, was tasked by Harrison Brothers with removing the fire-line *208 piping from the M/V Vinland Saga. This task required Harris to descend to the bottom of the Number One Hold. Harris was accompanied in this task by a welder, and, as they descended into the Number One Hold for the first time, Harris, upon reaching the tween deck, stepped aside to give the welder some room to come down the ladder. In doing so, Harris stepped off of the unguarded tween-deck ledge and fell approximately seven feet to the bottom of the hold, suffering a severe head injury that has required multiple surgeries and a lengthy rehabilitation.
Because of the circumstances of his injury, Harris received workers’ compensation benefits under the federal Longshore and Harbor Workers’ Compensation Act (“the LHWCA”), 33 U.S.C. § 901 et seq., as opposed to the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975. Like traditional state workers’ compensation statutes, the LHWCA sets forth a compensation scheme for injured longshoremen and shipyard workers that is generally their exclusive remedy for on-the-job injuries. However, § 905(b) of the LHWCA does permit a covered worker to assert a negligence claim against the owner of a ship on which the worker is injured, stating: “In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party....”[1]
On April 30, 2008, Carwie, as conservator for Harris, initiated an action against Knudsen pursuant to § 905(b), asserting, among other claims, that Harris’s injuries were the result of Knudsen’s negligence as the owner of the MW Vinland Saga. Instead of filing an answer to that complaint, Knudsen initiated a limitation-of-liability action in the United States District Court for the Southern District of Alabama, which subsequently entered an order limiting the scope of state-court proceedings while it considered certain federal issues. Ultimately, however, the federal issues required the federal district court to consider the issue central to Carwie’s state-court claim: Whether Knudsen had in fact been negligent. Both Carwie and Knudsen filed motions in the federal district court for a summary judgment focusing on that issue and specifically whether Knudsen had breached any of the duties a shipowner owes to longshoremen or shipyard workers working aboard its ship. As the federal district court noted in its April 28, 2010, order ruling on those motions: “‘The starting point in this regard must be [the Supreme Court’s] decision in Scindia Steam [Nav. Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981),] which outlined the three general duties shipowners owe to longshoremen.’ ” 710 F.Supp.2d at 1269 (quoting Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994)). The Supreme Court has described the three general duties outlined in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), as follows:
“The first, which courts have come to call the ‘turnover duty,’ relates to the condition of the ship upon the commencement of stevedoring operations. See [Scindia ] at 167. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas *209 that remain under the ‘active control of the vessel.’ Ibid. The third duty, called the ‘duty to intervene,’ concerns the vessel’s obligations with regard to cargo operations in areas under the principal control of the independent stevedore. See id., at 167-178.”
Howlett, 512 U.S. at 98, 114 S.Ct. 2057. The federal district court accordingly reviewed the evidence submitted by Carwie and Knudsen in support of their summary-judgment motions with regard to these three duties and held that factual issues precluded the entry of a summary judgment in either party’s favor with regard to whether Knudsen had breached the active-control duty or the duty to intervene; however, it held that Knudsen was entitled to a summary judgment with regard to the turnover duty. The federal district court then concluded its order entering a partial summary judgment in favor of Knudsen by noting that the issue whether the second and third Scindia duties were breached remained to be tried. 710 F.Supp.2d at 1274.
The record before this Court does not reveal exactly what transpired next in the federal district court; however, it apparently elected to let the state-court action proceed and for the state court to conduct the trial to determine whether the second and third Scindia duties had been breached. A four-day nonjury trial was held beginning January 10, 2011, and, at the close of all the evidence, Knudsen moved the trial court to enter a judgment in its favor. On February 3, 2011, the trial court granted that motion without making specific findings of fact and without explaining its rationale. Carwie subsequently appealed that judgment, and it now falls upon this Court to review that judgment pursuant to the following standard of review:
“Because the trial judge made no specific findings of fact, this Court will assume that the trial judge made those findings necessary to support the judgment. Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc., 578 So.2d 1061 (Ala.1991). Under the ore tenus rule, the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless ‘found to be plainly and palpably wrong.’ Fitzner, 578 So.2d at 1063. ‘The trial court’s judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.’ Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala.1989); see, also, Norman v. Schwartz, 594 So.2d 45 (Ala.1991).”
Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992). Thus, this Court must affirm the judgment in favor of Knudsen unless Carwie establishes that that judgment is “plainly and palpably wrong,” that is, wholly without credible evidence to support it. As will be explained below, I believe Car-wie has met that burden; the only conclusion that can be made based on the evidence adduced at trial is that Knudsen did in fact breach the Scindia active-control duty.
The active-control duty was described as follows in Scindia: *210 451 U.S. at 167, 101 S.Ct. 1614. Carwie argues that the undisputed evidence established that the Number One Hold was under the active control of Knudsen during the time the shipyard crew worked on the M/V Vinland Saga and that Knudsen failed to exercise due care to protect Harris from the open tween deck, thus breaching its duty to him. Knudsen argues that it presented ore terms evidence indicating that it had turned over control of the entire ship to the shipyard and that the trial court’s judgment should accordingly be affirmed. However, although Knudsen’s witnesses did testify that the M/V Vinland Saga was under the control of the shipyard at the time of Harris’s injury, that conelusory testimony is refuted by the actual evidence.
*209 “It is also accepted that the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.” .
*210 It is undisputed in this case that the crew of the M/V Vinland Saga was actively engaged in its own repair projects while the M/V Vinland Saga was in drydock and that crew members did their own work in the same general areas where Harrison Brothers personnel worked, including the Number One Hold. The testimony provided by Jonas Lyborg, Knudsen’s combination fact and expert witness, under cross-examination illustrates these facts and also serves as the basis for Knudsen’s argument as to why it did not have active control over the tween-deck area:
“Q. But the ship never took a step back here in the cargo hold, did it? The ship continued to work in the cargo hold the same area where the shipyard was working?
“A. They were doing painting and chipping in various cargo holds, yes, according to them.
“Q. Day after day from August 14th on through the date of the accident, correct?
“A. It’s mentioned in the log book several times, yes, frequently.
“Q. It’s an ongoing process?
“A. Looks like it.
“Q. And you reviewed the handover report the night before the accident, correct?
“A. I’ve seen the handover report, yes.
“Q. And the captain said that major work has been going on in the holds plural, both holds, correct?
“A. Yes.
“Q. And it’s not final yet, correct?
“A. No, the handover report indicates it’s not final.
“Q. So it’s going to continue in the future, okay. So in that scenario the ship controls the same area where the shipyard is working, the cargo hold?
“A. No.
“Q. Why not?
“A. Control the area would have meant that the crew member would be standing on deck at that hatch, that access hatch that was all before and say, ‘Mr. Lyborg, you are going down to the cargo hold. Okay, I accept that. Mr. Smith, you want to go down? No you are not going down.’ So they did not control the access to the cargo hold at all. And on the specific morning where the accident happened, there was — we don’t even know if there was any crew members there.
“Q. But the ship’s crew used the same access as the shipyard, correct?
“A. The crew used the same access, yes.
“Q. And worked in the same hold?
“A. Worked in the same hold, yes, correct.”
Thus, even though the ship’s crew was active in the Number One Hold where *211 Harris was injured, Knudsen asserts that it did not have active control over the area because it did not exercise exclusive and unfettered control over the area. However, although it is undoubtedly true that Knudsen did not exercise that level of control over the Number One Hold, it is equally true that the shipyard workers did not exercise exclusive control over the Number One Hold because the crew members appear to have had access to the hold whenever they desired it. See Baham v. Nabors Drilling USA, LP, 721 F.Supp.2d 499, 510 (W.D.La.2010) (“[A]lthough [the contractor] had begun his inspection of the underside of the crane, [the contractor] never had complete control over the ladder and walkway in question. To the contrary, this equipment remained in the control of [the shipowner] at the time of [the contractor’s] accident. [The shipowner’s] employees were never denied access to the crane via the ladder or pedestal walkway during [the contractor’s] inspection.”).
The only finding that the evidence supports, therefore, is that Knudsen and the shipyard workers shared control over the Number One Hold, including the tween deck. In cases with similar instances of shared control, courts have consistently held that the Scindia active-control duty is implicated when control over an area is shared between a ship’s crew and shipyard workers. See, e.g., Green v. United States, 700 F.Supp.2d 1280, 1303 (M.D.Fla.2010) (“The active operations duty does not require Defendant’s exclusive control; concurrent control is sufficient to invoke the broader duty of care.”); Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 537 (3d Cir.1994) (“The active operations duty applies to those areas under the vessel’s active control, even if the stevedore shares control with the vessel or if at some earlier time the area was under the stevedore’s exclusive control.”); and Lampkin v. Liberia Athene Transport Co., 823 F.2d 1497, 1502 (11th Cir.1987) (discussing Scindia and stating: “Establishing different standards of liability, contingent upon the degree of control exercised by the shipowner and the stevedore, is certainly desirable from a policy perspective. Otherwise, a shipowner would be free to ignore hazardous conditions that develop within areas under its exclusive or concurrent control, pending notification by the stevedore.”).
Thus, because the crew of the M/V Vineland Saga shared active control over the Number One Hold, Knudsen had a duty to exercise due care to protect Harrison Brothers personnel like Harris from hazards in that area. Knudsen argues that the open and unguarded tween deck Harris fell into was not a hazard; however, this argument is refuted by decades of caselaw indicating that an open and unguarded deck does present a hazard to shipyard workers and longshoremen unless there is evidence establishing that the deck was left open and unguarded for an essential purpose, such as to allow for the loading of cargo. There is no evidence in the record, however, indicating that the tween deck had been left open and unguarded for any specific purpose at the time of Harris’s accident.
The United States Court of Appeals for the First Circuit explained the test for determining whether a condition constitutes a hazard as follows in a similar case brought pursuant to § 905(b) of the LHWCA, stating:
“Generally speaking, the fact-finder should assess the ‘reasonableness’ of the vessel owner’s conduct ‘by balancing the usefulness to the [vessel] of the [allegedly] dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses.’ ”
*212 Keller v. United States, 38 F.3d 16, 25 (1st Cir.1994) (quoting Johnson v. A/S Ivarans Rederi, 613 F.2d 334, 348 (1st Cir.1980) (emphasis added in Keller)). Johnson is particularly relevant to the present case because it discusses the specific danger an open and unguarded tween deck presents and notes that the “reasonableness” analysis is merely a continuation of pre-LHWCA law:
“This approach for determining the reasonableness of a shipboard danger is also reflected in the pre-1972 law concerning open cargo hatches. While it was negligence for a vessel to leave tween deck hatch covers open and the hatch unlighted and unguarded if the hatch was not to be loaded with cargo, the existence of the very same conditions did not constitute negligence if the cargo was to be loaded into the hatch, since an open hatch is essential to the task of loading and unloading a ship. Compare Miller v. The Sultana, 176 F.2d 203, 206 [ (2d Cir.1949) ], with Badalamenti v. United States, 160 F.2d 422, 425-26 [ (2d Cir.1947) ].”
613 F.2d at 348. See also United States Fid. & Guar. Co. v. Jadranska Slobodna Plovidba, 683 F.2d 1022, 1026 (7th Cir.1982) (in which Judge Richard Posner notes that this reasonableness analysis echoes the analysis used by Judge Learned Hand in a 1947 maritime-negligence case, United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947)). Thus, it is the general rule that a shipowner is negligent in leaving a hatch or deck open and unguarded unless it does so for an essential purpose, such as the loading or unloading of cargo.
In the present case, Knudsen has identified no benefit it received from not guarding the open tween deck. It is also readily apparent that the builder of the M/V Vin-land Saga recognized that an open and unguarded tween deck was a hazard, because sockets were constructed along the edge of the ledge so that a stanchion and chain barrier could be inserted when the tween deck was open. See Woodruff v. United States, 710 F.2d 128, 130-31 (4th Cir.1983) (“ ‘The Navy obviously knew that there was a hazard in this area because they designed in their plans, when they built the ship ... a stanchion and rope system to guard against that opening.’ Placing the manual stanchions as a barrier against [the plaintiff] or anyone else working in the area falling overboard required a minimum of effort.” (quoting the trial court’s order)).
Thus, there is no evidence indicating that there was a useful reason for the tween-deck ledge to be unguarded. It is also apparent that a guard could have been installed without placing any significant burden upon Knudsen. As noted swpra, the infrastructure for installing such a guard was built into the ship. Furthermore, the United States Court of Appeals for the Seventh Circuit in United States Fidelity & Guaranty Co., 683 F.2d at 1027, another maritime-negligence case involving a longshoreman’s fall from an unguarded and open tween deck, identified various other low-cost ways such an accident could be prevented:
“As to ... the burden of precautions, there were various ways the shipowner could have prevented the accident. He could have lit the hold, locked the hatchway leading to it from the weather deck ..., roped off the open hatch, or placed a sign at the hatchway (though the effectiveness of this last precaution may be doubted).”
There was also specific evidence in this case indicating that it was possible to use a rope guard to protect against falls off of the tween deck of the M/V Vinland Saga.
*213 Finally, the fact that the builder of the M/V Vinland, Saga deemed it advisable to include a built-in stanchion-and-chain system to prevent falls into the open tween deck, as well as the number of legal opinions dealing with falls into open decks, indicate that open and unguarded decks pose a not insignificant probability of harm. The possibility of severe harm resulting from a fall off an approximately seven-foot drop to a metal floor is self-evident. Knudsen’s argument that others successfully navigated the tween deck while moving from the main deck to the bottom of the hold might be considered as an argument that the probability of harm posed by the unguarded ledge was sufficiently low that there was effectively no hazard; however, similar arguments have been rejected by other courts. See, e.g., Jupitz v. National Shipping Co. of Saudi Arabia, 730 F.Supp. 1358, 1363 n. 9 (D.Md.1990) (“This is not to say, however, that proof that a worker has not been injured on previous occasions while working under similar conditions is proof that the circumstances encountered on those occasions were not unreasonably hazardous.”). Moreover, as noted previously, such an argument would fly in the face of decades of caselaw holding that the risk of severe injury posed by an unguarded open deck is sufficiently high as to outweigh even that low probability. See Johnson, 613 F.2d at 342 (“The general rule concerning injuries received by longshoremen who fell into the open holds of ships was that the vessel was not negligent in leaving cargo hatches open and unguarded to permit the loading of cargo. See, e.g., Miller v. The Sultana, 176 F.2d 203, 206 (2d Cir.1949); Ove Tysko v. Royal Mail Steam Packet Co., 81 F.2d 960, 962 (9th Cir.1936); Long v. Silver Line, Ltd., 48 F.2d 15, 16 (2nd Cir.1931). However, it was negligence for the vessel to leave cargo hatches open and unguarded on a working deck if the particular hatch was not to be worked. See, e.g., Badalamenti v. United States, 160 F.2d 422 (2d Cir.1947); The Omsk, 266 F. 200 ([4]th Cir.1920); West India and P.S.S. Co. v. Weibel, 113 F. 169 (5th Cir.1902).”). Weighing the facts that the unguarded and open tween deck apparently served no useful purpose and that the ledge could have been guarded with a minimum of effort against the probability of an accident and the obvious risk of severe harm posed by a fall, one can only conclude that the unguarded tween deck presented an unreasonable risk of harm to shipyard workers transferring ladders on the tween deck and was, therefore, a hazard.
Importantly, this conclusion cannot be avoided merely because of the application here of the ore tenus standard of review and because there was testimony at trial indicating that some witnesses did not consider the unguarded tween deck to be a hazard. If there was any evidence in the record indicating that the ship’s crew had left the tween deck open and unguarded on the date of Harris’s accident for some necessary reason or as an essential part of their work, the judgment of the trial court would of course be due to be affirmed under the ore tenus standard. However, no such evidence has been identified, and, in fact, Knudsen has emphasized that there is no evidence establishing that the ship’s crew was working in the Number One Hold at all on the morning of Harris’s accident before he fell, which would seem to indicate that there was no special purpose in leaving the deck unguarded. I disagree that the eonclusory opinions of witnesses who believe that a condition does not constitute a hazard — without any supporting evidence or consideration of the relevant analysis — is sufficient under the ore tenus standard to support a finding that that condition is not a hazard, espe- *214 dally when those condusory opinions are contradicted by decades of caselaw holding that decks left open and unguarded for no apparent reason are a hazard.
Thus, the evidence indicates that the unguarded tween deck was a hazard in an area over which the crew of the M/V Vin-land, Saga shared active control. Knudsen therefore had a duty to exercise due care to protect Harrison Brothers personnel from that hazard. It failed to do so, and that breach, that is, the failure to guard the tween-deck ledge, was a proximate cause of Harris’s accident and injury. The judgment entered by the trial court in favor of Knudsen is accordingly unsupported by the evidence and is therefore due to be reversed. I respectfully dissent from the majority’s no-opinion affirmance, which, I believe, is in stark contrast to decades of jurisprudence in similar maritime cases involving falls into unguarded and open decks. See, e.g., Johnson, 613 F.2d at 342-48.
PARKER, J., concurs.

. "Vessel” is defined in 33 U.S.C. § 902(21) to include the "vessel’s owner, owner pro hac vice, agent, operator....”