


FILED

Apr 08 2026, 1:11 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 26S-CT-112

## Yerano Martinez and Jessica Martinez
*Appellants (Plaintiffs below)*

—v—

## Jeffrey Smith, et al.
*Appellees (Defendants below)*

Argued: June 5, 2025 | Decided: April 8, 2026

Appeal from the Marion Superior Court,
No. 49D05-2005-CT-15308
The Honorable John M.T. Chavis II, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 24A-CT-1272

**Opinion by Justice Goff**

Chief Justice Rush and Justice Massa concur.
Justice Molter concurs with separate opinion in which Chief Justice Rush joins
as to Parts II–IV.
Justice Slaughter dissents with separate opinion.

**Goff, Justice.**

In *Reece v. Tyson Fresh Meats, Inc.*, this Court adopted a bright-line rule under which "landowners owe a duty to passing motorists on adjacent highways not to create hazardous conditions that visit themselves upon the roadway" but have no such obligation when the land use or condition is "wholly contained on a landowner's property."[1] In this case, we're tasked with clarifying what we meant in *Reece* by the term "roadway." Is the duty to refrain from creating hazardous conditions confined to the surface of the road itself? Or does that duty encompass something more? We hold that the common-law duty under *Reece* to refrain from creating hazardous conditions encompasses not just the paved portion of the roadway but also traffic-control devices within the public right-of-way. And because the hazardous condition here, by the landowner's own admission, amounted to such an impermissible encroachment, we hold that the trial court erred by granting summary judgment in favor of the landowner. Accordingly, we reverse.

# Facts and Procedural History

On the afternoon of Halloween Day 2019, Yerano Martinez drove through a stop sign located at the intersection of County Road 300 North and State Road 19 in Miami County, colliding with a truck and sustaining serious injuries. At the time of the accident, the stop sign was allegedly obscured by an overgrown bush located on property owned by Jeffrey Smith and extending partially into Miami County's right-of-way. Martinez sued, alleging that Smith, despite his duty to passing motorists, failed to maintain his property to "discover and remedy obstructions

---

[1] 173 N.E.3d 1031, 1034 (Ind. 2021) (internal quotation marks and citation omitted).

impeding the view of the stop sign."[2] App. Vol. 2, p. 27. Smith moved for summary judgment, arguing that, because the bush didn't intrude upon the roadway, he owed no duty of care under this Court's decision in *Reece v. Tyson Fresh Meats, Inc.*, 173 N.E.3d 1031 (Ind. 2021). Martinez responded by arguing that the bush *was* located in the public right-of-way, so Smith had a duty to protect passing motorists under *Reece*. The trial court entered summary judgment for Smith, explaining the "difference between a right of way and a roadway" and concluding that *Reece* "did not extend" the landowner's duty to the former. App. Vol. 2, pp. 21–22.

In a unanimous opinion, the Court of Appeals affirmed, holding that, under *Reece*, Smith owed no duty to Martinez. *Martinez v. Smith*, 249 N.E.3d 1096, 1100 (Ind. Ct. App. 2024). Under the bright-line rule adopted in *Reece*, the panel stressed, "landowners must protect motorists from hazards that extend onto the roadway but have no duty" to protect against "conditions that remain entirely on their property." *Id.* at 1098. And though the *Reece* opinion referred occasionally to the "public right of way," the panel explained that the Court there intended to use that term synonymously with "roadway," *i.e.*, the road surface itself, rather than a county easement over which motorists do not necessarily have a right to travel. *Id.* at 1099. The panel also found significant the fact that the *Reece* opinion used "roadway" more than a dozen times while referring only twice to the "public right of way." *Id.* Because the overgrown bush extended only into the county easement and not onto the roadway, the

---

[2] Martinez also sued the Miami County Board of Commissioners, the Miami County Highway Department, and the State of Indiana. But because the trial court entered final judgment for Martinez and Smith only, the government entities are not parties to this appeal. *See* App. Vol. 2, pp. 19–22; Ind. Trial Rule 54(B) (allowing for entry of final judgment for fewer than all parties).

panel concluded, finding a duty here would improperly expand the rule in *Reece*. *Id.* at 1100.[3]

Martinez petitioned for transfer, which we now grant, vacating the Court of Appeals' opinion. *See* Ind. Appellate Rule 58(A).

## Standard of Review

When reviewing summary judgment, this Court uses "the same standard as the trial court," that is summary judgment is proper only when the designated evidence shows "no genuine issue of material fact" and the moving party is "entitled to judgment as a matter of law." *Reece*, 173 N.E.3d at 1033 (citing Ind. Trial Rule 56(C)).

## Discussion and Decision

Under Indiana common law, a person who "owns or occupies land has a duty to the traveling public on adjacent highways to exercise reasonable care to prevent injury to travelers from 'unreasonable risks' the owner or occupier creates." *Id.* at 1034 (quoting *Pitcairn v. Whiteside*, 34 N.E.2d 943, 946 (Ind. Ct. App. 1941)). In *Reece*, we sought "to clarify what types of land uses or conditions implicate this duty in cases where motorists claim their views were obstructed." *Id.* We described our task as deciding "the correct approach for conditions that do not intrude on the public right-of-way but rather are visual obstructions contained wholly on the land." *Id.* at 1040. In resolving the issue, the Court adopted a bright-line rule holding that, while "landowners owe a duty to passing motorists on adjacent highways not to create 'hazardous conditions that visit themselves upon the roadway,'" there is no duty to the traveling public "when a land use or

---

[3] The panel also rejected Martinez's argument that, though the bush didn't physically intrude onto the roadway, it still "visited" itself upon the roadway because it affected traffic operations by blocking the stop sign. *Martinez v. Smith*, 249 N.E.3d 1096, 1100 (Ind. Ct. App. 2024). Such a theory, the panel concluded, stands at odds with the language used in *Reece* and "would completely replace the analysis" set forth in that decision. *Id.*

condition that may impose a visual obstruction is 'wholly contained on a landowner's property.'" *Id.* at 1034 (quoting *Sheley v. Cross*, 680 N.E.2d 10, 13 (Ind. Ct. App. 1997)).

Martinez argues that, because it was situated partially within the county's right-of-way, the hazardous condition here—the overgrown bush—wasn't "wholly contained" on Smith's property. Appellant's Reply Br. at 6. For the common-law duty under *Reece* to apply, he insists, the dangerous condition need not extend onto or physically encroach upon the "traveled portion" of the adjacent roadway. Appellant's Br. at 9, 13. Rejecting this proposition, Smith emphasizes the distinction between a "public right-of-way" (*i.e.*, a roadway) and a county right-of-way easement (over which the public has no right to travel). Resp. in Opp. to Trans. at 7; Appellee's Br. at 11–12. Smith argues that Martinez's theory, if upheld, would lead to the absurd result of allowing the public to drive through the "right of way" portion of Smith's yard. Appellee's Br. at 13.

We stand with Martinez.

## I.  Landowners owe a duty to motorists on adjacent highways to reasonably prevent conditions on their property from obstructing a traffic-control device located in the public right-of-way.

In affirming summary judgment for Smith, the Court of Appeals here acknowledged the *Reece* Court's references to the "public right of way." *Martinez*, 249 N.E.3d at 1098. But to read that term as encompassing "both the road surface as well as the strip of roadside land over which the county has an easement," the panel concluded, would misinterpret *Reece* and improperly extend the scope of the duty set forth in that decision. *Id.* The panel reached this conclusion from a "reading of the entire opinion" in *Reece* (showing that the Court intended to use "roadway" and "public right of way" synonymously) and the cases on which the *Reece* decision relied. *Id.* at 1099.

We agree with the Court of Appeals that *Reece* used "roadway" and "public right of way" synonymously. But we reject the idea that either term is necessarily confined to the paved portion or surface of the road. What's more, a stop sign, like any traffic-control device, *is* an integral part of the roadway.

## A. The common-law duty under *Reece* is not confined to the paved portion of the roadway.

To begin with, the Indiana common law has long considered it "unlawful" to place or "leave continuously in a public highway anything which either impedes or endangers public travel"—a rule applicable "to the whole width of the highway, and not merely to a worn portion of it commonly used for passage." *Indianapolis Water Co. v. Schoenemann*, 20 N.E.2d 671, 677 (Ind. Ct. App. 1939) (quoting *Indiana Nat. & Illuminating Gas Co. v. McMath*, 57 N.E. 593, 594 (Ind. Ct. App. 1900)). To be sure, a condition on an abutting landowner's property that falls outside "the traveled portion of the right-of-way" does not, by itself, amount to an impermissible encroachment. *See Town of Ogden Dunes v. Wildermuth*, 235 N.E.2d 73, 76 (Ind. Ct. App. 1968). But such an exemption applies only when the encroachment creates no "dangerous hazard" to the public. *Id.* (holding that a fence erected by an abutting landowner outside "the traveled portion of the right-of-way" was not unlawful absent evidence that it created a "dangerous hazard" or obscured the view of passing motorists); *see also City of Evansville v. Follis*, 315 N.E.2d 724, 726 (Ind. Ct. App. 1974) (holding that a landowner's construction of a wall outside the "traveled portion of the street" was a permissible encroachment upon the city's "right-of-way" absent evidence that the improvements obstructed the "vision of drivers upon the street" or otherwise interfered "in any way

with the City's use of its right-of-way").[4] *Cf. Reece*, 173 N.E.3d at 1041 (holding that the landowner owed no duty to the motoring public because "the visual obstruction was *wholly contained* on the land") (emphasis added).

This precedent, which recognizes the need to prevent the encroachment of dangerous obstructions beyond just the "traveled portion" of the public right-of-way, aligns with common usage of the terminology at issue here. General dictionaries, for example, define "right-of-way" as "the strip of land devoted to or over which is built a public road" without confining the term to the public road itself. *See Right-of-Way*, Webster's Third New Int'l Dictionary 1956 (2002 ed.). The term "roadway" carries a virtually identical meaning: a "strip of land *through which* a road is constructed." *Id.* at 1963 (emphasis added). To be sure, "roadway" may refer *specifically* to "the part of a road over which vehicular traffic travels." *Id.* But Indiana courts have eschewed such a precise definition, preferring instead to interpret the term as it's "ordinarily used"—that is, as a "strip of land over which a road is constructed"—without limiting it to the surface of the road itself. *Austin v. Durbin*, 310 N.E.2d 893, 895 (Ind. Ct. App. 1974).

Several pertinent statutory definitions reflect this common usage, bolstering our broad understanding of the relevant terms. Under our motor-vehicle code, for example, the term "roadway" is defined as "that part of a highway improved, designed, or ordinarily used for vehicular travel." Ind. Code § 9-13-2-157(a). This definition expressly "does not

---

[4] The dissent finds it "telling that none of these three cases merited discussion in *Reece*, prompting the question whether *Reece* overlooked important case law, or whether today's Court goes astray by citing these cases." *Post*, at 3. But the *Reece* Court, as the dissent itself implicitly acknowledges, wasn't tasked with defining "roadway," so it had no need to survey common-law definitions of that term. *See id.* at 2 (conceding that, "[i]n hindsight, we now learn that what *Reece* meant by 'roadway' would be hotly contested"). And it's certainly not unusual for courts to rely on the common law to define specific terms or phrases. *See, e.g.*, *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1181 (Ind. 2018) (relying on "early American common law" definitions of the "ordinary high water mark" to determine the precise boundary separating public-trust land from privately owned riparian land along the shores of Lake Michigan); *Owens v. Lewis*, 46 Ind. 488, 508 (1874) (relying on the "common law definition" of "land" in determining the scope of a contract for the sale of an interest in land).

include the sidewalk, berm, or shoulder," but *only* for purposes of regulating school-bus stops, suggesting that, outside of this context, the term extends beyond those portions of the road traversed by the motoring public.[5] *See* I.C. § 9-13-2-157(b). In another section of our motor-vehicle code, "highway" or "street" refers to "the entire width between the boundary lines of every publicly maintained way *when any part of the way* is open to the use of the public for purposes of vehicular travel in Indiana." I.C. § 9-13-2-73 (emphasis added). *See also* I.C. § 8-23-1-23 (defining a "highway, street, or road" as "a public way for purposes of vehicular traffic, including the entire area within the right-of-way").

In short, neither Indiana common law nor standard usage (as reflected in dictionary definitions and pertinent statutes) have strictly confined "roadway" or "public right-of-way" to the pavement on which the motoring public traverses.

## B.  A stop sign, like any traffic-control device, is an integral part of the roadway.

Still, Smith emphasizes the distinction between a public right-of-way (*i.e.*, a roadway) and a county right-of-way easement over which the public has no right to travel. Resp. in Opp. to Trans. at 7; Appellee's Br. at 11, 12. The Court of Appeals agreed, citing the "*Reece* Court's deliberate use of the word 'public' when referring to a right-of-way" as evidence that we "meant to impose a duty only on areas the traveling public uses, like roadways." *Martinez*, 249 N.E.3d at 1099. "This word choice matters," the panel explained, "because it distinguishes roadways from county right-of-way easements, which aren't necessarily public areas." *Id.*

---

[5] Smith points to code section 9-13-2-155, which, on first impression, stands at odds with the broader statutory definitions cited above. But that statute defines not a particular portion of land; instead, it refers to the "*privilege* of the immediate use of a highway" for purposes of the motor-vehicle code. I.C. § 9-13-2-155 (emphasis added).

We agree that motorists do not necessarily have a right to travel on anything other than the paved portion of the public right-of-way.[6] We likewise agree that *Reece* intended to "impose a duty only on areas the traveling public uses, like roadways." *See id.* But the motoring public's ability to navigate the Crossroads of America depends on more than just the surface of the roadway itself. As Martinez points out, a stop sign, like any traffic-control device, *is* "part of the roadway because the roadway simply cannot function without [it]." *See* Pet. to Trans. at 11.

The legislature itself appears to have contemplated traffic-control devices as an integral part of the roadway. The motor-vehicle code, for example, charges the department of transportation with erecting and maintaining traffic-control devices "*upon* all state highways." I.C. § 9-21-4-2(a) (emphasis added). A contiguous section of the code refers to specific standards a government agency must follow "for the signing, marking, and erection of traffic control devices *on* streets and highways." I.C. § 9-21-4-1 (emphasis added). *Cf. City of Angola v. Hulbert*, 162 N.E.2d 324, 329 (Ind. Ct. App. 1959) (stressing analogous language to interpret a statute prohibiting the installation of advertising signs "*on the highway*" or within a certain distance from the highway). And to ensure visibility of these traffic-control devices, a "county highway right-of-way" may encompass an "additional width" for, among other things, "*public safety*." I.C. § 8-20-1-15 (emphasis added).

Under Smith's theory, a landowner, without consequence, could build a wall that obscures the view of a stop sign so long as that wall doesn't encroach upon the surface of the roadway. But our common law says otherwise. *See Schoenemann*, 20 N.E.2d at 677; *Wildermuth*, 235 N.E.2d at 76; *Follis*, 315 N.E.2d at 726. To be sure, these cases involved not overgrown bushes but, rather, artificial structures. But as Smith himself properly acknowledges, the "condition causing the visual obstruction can be

---

[6] Although Indiana courts have "recognized the right of the traveler 'to deviate from the established road on adjacent land when the highway becomes impassable.'" *Chicago & E.R. Co. v. Hunter*, 113 N.E. 772, 776 (Ind. Ct. App. 1916) (quoting *Small v. Binford*, 83 N.E. 507, 509 (Ind. Ct. App. 1908)).

natural or artificial," given that *Reece* rendered that distinction "irrelevant." Appellee's Br. at 10.

Finally, we recognize that the county itself "has a common law duty to exercise reasonable care and diligence to keep its streets and sidewalks in a reasonably safe condition for travel." *Ladra v. State*, 177 N.E.3d 412, 415 (Ind. 2021) (internal quotation marks and citation omitted). But a county or other state subdivision's "responsibility to place and maintain stop signs does not, by itself, establish a public policy to absolve adjoining landowners from liability for the interference with sign visibility created by trees [or other conditions] on their land." *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 632 N.W.2d 59, 67 (Wis. Ct. App. 2001), *aff'd*, 646 N.W.2d 777 (Wis. 2002). What's more, a county may only be "held liable for a dangerous defect or condition in a highway" if it has "knowledge, either actual or constructive, of the dangerous, unsafe or hazardous condition." *Boger v. Lake Cnty. Comm'rs*, 547 N.E.2d 257, 259 (Ind. 1989). Absent such knowledge, "the result would be that an obvious hazard to public safety could continue to exist, with no one having any obligation to correct it." *Physicians Plus*, 632 N.W.2d at 66.

## C. Our decision imposes no more of an onerous burden on landowners than if the duty were confined only to the roadway surface.

To reiterate, the bright-line rule adopted by this Court in *Reece* holds that, while "landowners owe a duty to passing motorists on adjacent highways not to create hazardous conditions that visit themselves upon the roadway," there is no duty to the traveling public when a land use or condition is "wholly contained on a landowner's property." 173 N.E.3d at 1034 (internal quotation marks and citation omitted). To hold otherwise, the Court reasoned, would impose "too onerous" a duty on "a property owner to continually inspect the perimeters of his property, particularly along an adjacent highway, to make sure that dangerous conditions do not arise for those traveling on the highway." *Id.* at 1040 (quoting *Blake v. Dunn Farms, Inc.*, 413 N.E.2d 560, 566–67 (Ind. 1980)).

Our decision today, interpreting the duty under *Reece* to encompass traffic-control devices within the public right-of-way, imposes no more of an onerous burden on a landowner than if the duty were confined to the surface of the roadway itself. Rather, our decision simply clarifies *where*, under our bright-line rule, the landowner's responsibility begins and where it ends. And this duty arises *only* from our common law. As we emphasized in *Reece*, "our holding in no way prevents the General Assembly or local legislative bodies from enacting statutes or ordinances" that dictate otherwise. *See* 173 N.E.3d at 1041.

## II. Because the visual obstruction was *not* wholly contained on the land, Smith owed a duty to the motoring public.

Having decided that the common-law duty under *Reece* encompasses traffic-control devices within the public right-of-way, we must now decide whether summary judgment is proper for either party.

In *Reece*, a motorcyclist sustained "catastrophic injuries" after colliding with a car at an intersection adjacent to the landowner's property. *Id.* at 1033. Tall grass growing in a ditch on the property obscured the motorcyclist's view of the oncoming car, but neither party disputed that, at "the time of the collision, the grass didn't extend onto the road." *Id.* And because this visual obstruction was "wholly contained on the land," the landowner "owed no duty to the motoring public" under the Court's bright-line rule and, thus, summary judgment was proper. *Id.* at 1041.

Here, by contrast, the parties dispute whether the bush at issue was, in fact, "wholly contained" on Smith's land. In his motion for summary judgment, Smith argued that he owed no duty of care to Martinez because "the bush in question never extended out into the roadway." App. Vol. 2, p. 158. But by admitting that the trunk of the bush fell *within* the county right-of-way, *see id.* at 43, 161, Smith acknowledged, under our holding today, that the condition was *not* "wholly contained" on his property. Smith, thus, failed to carry his initial burden of showing the absence of a

genuine issue of material fact. Accordingly, the trial court erred by granting summary judgment in his favor.

In reaching this conclusion, we reiterate that a condition on an abutting landowner's property falling outside "the traveled portion of the right-of-way" becomes an impermissible encroachment *only* when it creates a "dangerous hazard" to the motoring public. *See Wildermuth*, 235 N.E.2d at 76. And in most cases, whether a condition amounts to such a "dangerous hazard" will be a question for the trier of fact to determine. But here, there are no factual issues to resolve, as Smith himself assumed, for summary-judgment purposes, that the bush *did* present a "visual obstruction." Oral Argument at 28:50–29:02; *see also* App. Vol. 2, p. 158 (making the same assumption).

# Conclusion

For the reasons above, we hold that, under *Reece*, a landowner's common-law duty to refrain from creating hazardous conditions for passing motorists on adjacent highways encompasses traffic-control devices within the public right-of-way. And because the hazardous condition here, by Smith's own admission, impermissibly encroached into the public right-of-way, we hold that the trial court erred by granting summary judgment in his favor.

Reversed.

Rush, C.J., and Massa, J., concur.
Molter, J., concurs with separate opinion in which Rush, C.J., joins as to Parts II–IV.
Slaughter, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT
Scott A. Faultless
Sidney M. Lewellen
William E. Beck
Craig Kelley & Faultless LLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
Sheila M. Sullivan
Flynn & Sullivan PC
Indianapolis, Indiana

**Molter, J., concurring.**

In *Reece v. Tyson Fresh Meats, Inc.*, our Court held that "a landowner owes a duty to passing motorists on an adjacent highway to not create hazardous conditions that visit themselves upon the roadway." 173 N.E.3d 1031, 1041 (Ind. 2021) (quotations omitted). Today the Court holds that duty includes not creating hazardous conditions that extend into the public right-of-way and obstruct traffic-control devices. More specific to the allegations in this case, that means a landowner is not absolved of liability if injury results from the landowner unreasonably letting a bush grow into the public right-of-way such that it obstructs a driver's view of a stop sign. I agree with this holding and join the Court's opinion in full. I write separately merely to amplify the discussion in Part I.C. of the Court's opinion, which in my view is the key, indispensable ingredient to the Court's analysis and best addresses the dissenting opinion's concerns about our common law's clarity and consistency.

I.

"To recover under a theory of premises liability sounding in negligence, the plaintiff must prove three elements: (1) a duty owed to the plaintiff, (2) a breach of that duty by the defendant, and (3) the breach proximately caused the plaintiff's damages." *Isgrig v. Trs. of Ind. Univ.*, 256 N.E.3d 1238, 1244 (Ind. 2025) (quoting *McCraney v. Gibson*, 952 N.E.2d 284, 288 (Ind. Ct. App. 2011)). "Duty" can be a misleading label for the first element, though, and that mislabeling causes an inordinate amount of confusion. *Cf. Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 387 (Ind. 2016) ("For a period of at least over the past two decades or so our case law has been less than perfectly lucid in explaining how a court determines whether a duty exists in the context of a negligence claim."); *see also* John C. P. Goldberg & Benjamin C. Zipursky, *The Restatement (Third) and the Place of Duty in Negligence Law*, 54 Vand. L. Rev. 657, 698-723 (2001) (distinguishing between four different "senses" in which courts refer to "duty," including duty as an obligation, duty as a nexus between breach and duty, duty as breach as a matter of law, and duty as an exemption from the operation of negligence law).

Most often, negligence claims may be more clearly understood by first "recognizing that every actor has an obligation to behave reasonably" when their conduct creates a risk of harm to others. Hon. Theodore R. Boehm, *A Tangled Webb-Reexamining the Role of Duty in Indiana Negligence Actions*, 37 Ind. L. Rev. 1, 1 (2003); *see also* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 7(a) (A.L.I. 2010) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."). And then when we say the defendant owed no duty to the plaintiff, what we really mean is that there is some consideration, usually a public-policy consideration, that leads the court to preclude liability as a matter of law without considering whether the defendant behaved unreasonably given the facts of a particular case. Boehm, *supra*, at 19 (arguing we should proceed "on the assumption that all of us are obliged to take reasonable steps to avoid harm to others in the activities we undertake and can control," and the "duty" analysis then "resolves itself to an inquiry into whether there is some reason in policy why the law should nevertheless preclude recovery" even if the defendant's unreasonable conduct caused harm); *see also* Restatement (Third) of Torts: Phys. & Emot. Harm § 6 (2010) ("An actor whose negligence is a factual cause of physical harm is subject to liability for any such harm within the scope of liability, *unless the court determines that the ordinary duty of reasonable care is inapplicable*." (emphasis added)); *id.* § 7(b) ("In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.").

For a time, we said that courts should decide whether there is a duty by balancing three factors: "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991), *disapproved of by Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016). We've drifted from that approach, and now it seems more accurate to say that no-duty or limited-duty rules may emerge from any one or a combination of those factors. *See Goodwin*, 62 N.E.3d at 387 (acknowledging our Court's "limited fidelity" to the three-part *Webb*

balancing test); *Cowe ex rel. Cowe v. F. Grp.*, 575 N.E.2d 630, 636 (Ind. 1991) (acknowledging the "nebulous nature of the concept of duty," that "no universal test for it ever has been formulated," and that "[n]o better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists").[1]

For example, duty-based limitations on premises owners' liability often turn on the defendant's relationship to the plaintiff, specifically whether the plaintiff was a trespasser, licensee, or invitee. *Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind. 1991). The rule that bars do not owe patrons a duty to protect against third-party criminal attacks is based on foreseeability and "the public policy of this state" that proprietors are not "insurers of their patrons' safety." *Goodwin*, 62 N.E.3d at 394. At bottom, "[p]ublic policy has always been the linchpin of duty," and the relationship and foreseeability factors "are either subsumed into the policy issue or more properly viewed as bearing on issues for the trier of fact," such as the jury

---

[1] Justice Slaughter has some concern that I may be advocating "a wholesale change in our tort law." *Post*, at 10. My view isn't so bold. The United States Supreme Court has observed that the Third Restatement's explanation of duty, which is the articulation I'm suggesting, reflects "basic tort-law principles." *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 452 (2019). The Third Restatement's approach is also consistent with "the cases and the understanding of major commentators." 2 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 251 (2d ed. 2011) (footnotes omitted). Very little, if any, daylight appears between Justice Slaughter's view and mine. In the end, we both seem to be saying that "duty is no more than the sum of the policy considerations bearing on the plaintiff's right to recover," and the key clarification in my preferred articulation is to acknowledge that "duty, or the absence of duty, is an expression of the result of the analysis, not a tool used to reach that result." Boehm, *supra*, at 6. Or as our Court has repeatedly explained, "Duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Mangold ex rel. Mangold v. Ind. Dep't of Nat. Res.*, 756 N.E.2d 970, 974 (Ind. 2001) (brackets omitted) (quoting *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 (5th ed. 1984))). My objective is "not a different result in any specific case," and I'm not proposing to expand tort liability in Indiana. Boehm, *supra*, at 18. Instead, the goal is a "better understanding of the principles underlying the result, and therefore more coherent precedent for the future." *Id.* All that said, Justice Slaughter correctly notes that this case does not turn on how we articulate the duty element, and I welcome the opportunity he acknowledges for future briefing and deliberation. *Post*, at 10.

questions of whether the defendant's behavior was unreasonable or whether it was the proximate cause of injury. Boehm, *supra*, at 11.

## II.

*Reece*'s rule—that "when a land use or condition that may impose a visual obstruction is wholly contained on a landowner's property, there is no duty to the traveling public"—was based on public policy. *Reece*, 173 N.E.3d at 1034 (quotations omitted). Specifically, the public policy concern was that "it would be too onerous to impose a duty on a property owner to continually inspect the perimeters of his property, particularly along an adjacent highway, to make sure that dangerous conditions do not arise for those traveling on the highway." *Id.* at 1040 (quotations omitted). Still, we also concluded it is not too onerous, and there is a duty, for landowners to make reasonable efforts to ensure they don't create hazards that visit themselves on the roadway. *Id.* at 1041.

The *Reece* analysis reflects a law-and-economics approach consistent with Judge Learned Hand's algebraic expression of negligence liability: There is liability when B < P x L, where B is the burden (or cost) of taking precautions, P is the probability that harm will occur without the precautions, and L is the gravity of the potential loss or injury. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). When the defendant's burden is less than the probability multiplied by the gravity of harm, we expect the defendant to shoulder the burden; but when the burden is greater than the probability multiplied by the gravity of harm, we don't expect the defendant to shoulder the burden. *See Conway v. O'Brien*, 111 F.2d 611, 612 (2d Cir. 1940) (Hand, J.) ("The degree of care demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk."), *rev'd*, 312 U.S. 492 (1941).

Judge Hand used the formula to analyze the breach element of a tort claim when he was deciding "when the absence of a bargee or other attendant will make the owner of the barge liable for injuries to other vessels if she breaks away from her moorings." *Carroll Towing*, 159 F.2d at 173. But the formula "can be used not only to deduce the outcomes of

particular cases but to deduce all sorts of interesting doctrines," including our doctrinal approach to evaluating legal duties. Richard Posner, *Jurisprudential Responses to Legal Realism*, 73 Cornell L. Rev. 326, 327–28 (1988). In other words, while Judge Hand used the formula to analyze whether an *individual* defendant behaved reasonably, the same formula can also guide judges in answering a different question—determining what duties to impose on defendants when that answer depends on the judge's impression of *aggregate* costs and benefits.

In terms of the Hand formula, the *Reece* analysis reflects the common experience that: (1) while colliding cars often cause serious injury or death (the "L"); (2) it would be too burdensome to require landowners to constantly police their property to ensure they have not created or allowed any visual obstructions from any angle of the intersecting roads bordering their property (the "B"); (3) given that failing to take that precaution will not often cause accidents so long as the hazards do not visit themselves on the roadway (the "P"). Since B > P x L—the aggregate burden on landowners outweighs the aggregate societal benefit—we relieve landowners of liability for failing to protect against hazards that remain wholly contained on their property regardless of the reasonableness of the landowner's conduct in a particular case.

At the same time, *Reece* also reflects the common experience that: (1) since colliding cars often cause serious injury or death (the "L"); (2) it is not too burdensome to impose the less onerous requirement to ensure that landowners do not create or allow hazards that visit themselves on the roadways (the "B"); (3) because hazards that visit themselves on the roadways are much more likely to cause accidents (the "P"). Since B < P x L—the aggregate societal benefits outweigh the aggregate burden on landowners—we expect landowners to take reasonable measures to ensure they do not create or allow hazards from their property to visit themselves upon the roadway. And we do not relieve them of liability when their failure to do so is a proximate cause of the plaintiff's injury.

Justice Slaughter assesses this way of understanding *Reece* to be a "stretch," but he never reveals his own understanding of *Reece*'s underlying rationale. *Post*, at 7. He does mention that he likes that "*Reece*

imposed a bright-line rule." *Id.* at 2. But I presume he didn't sign onto the *Reece* opinion just because the line it drew was bright; surely he thought there was a good reason for the line's placement too. Yet we're left to wonder not just what that reason was, but also why that reason doesn't apply here.

III.

In any event, the same public policy approach from *Reece*—balancing the benefits and burdens—guides the line drawing here. Regardless of whether the public right-of-way is considered part of the roadway or not, the burden of keeping the public right-of-way clear of obstructions in front of traffic signs is not meaningfully more onerous than keeping the area over the asphalt clear of obstructions. And the impact on reducing the risk of injury is similar too. So when a landowner's unreasonable failure to keep the public right-of-way clear of obstructions blocking a traffic signal proximately causes an injury, the law does not relieve that defendant of liability.

Consistent with this view, the General Assembly already imposes on many landowners—including the defendant here, it appears—the obligation to keep the public right-of-way clear of hazards that visually obstruct traffic control signals. Ind. Code §§ 32-26-4-1 and -2; I.C. § 1-1-4-5(a)(7); I.C. §§ 9-21-4-4 and -6; I.C. § 9-13-2-73. To be clear, that is not to suggest there is an implied statutory right of action. But the question we confront is whether there is a good reason for the common law to effectively immunize unreasonable conduct that presents the risk of serious, even fatal, injury. These statutes reflect there is no such reason, and the common law does not impose too heavy a burden by declining to immunize property owners from their negligence in obstructing traffic signs.

The dissenting opinion provides another good illustration, pointing to *Sheley v. Cross*, 680 N.E.2d 10 (Ind. Ct. App. 1997), which held that a landowner owed no duty to the traveling public to keep crops from impairing a motorist's view at an intersection. A key reason we don't impose such a duty is that the cost would be great and not worth it; if there were a duty to keep crops from creating that sort of visual

obstruction, we could no longer have massive corn fields in Indiana because during the summer and fall the corn in those fields grows tall enough to block the view of intersecting traffic. Instead, we rely on a much less burdensome but still very effective tool: traffic signals.

Yet, as I understand Justice Slaughter's view, he concludes our common law should condone farmers planting corn directly in front of stop signs even when that presents an obvious, unreasonable risk of injury and death. It's unclear why that result would be sensible. Instead, since the enormous benefit of keeping corn from obstructing stop signs outweighs the modest burden, there is no reason to absolve farmers of the duty merely to exercise reasonable care in those circumstances.

For all our safety, traffic signs need to be clear of obstructions. When it is most efficient in the aggregate to make property owners responsible for clearing obstructions on their own land, the common law does not relieve them of liability for failing to do so unreasonably; when it is not most efficient for them to do so, our common law does relieve them of that liability. *See* Richard A. Posner, *Instrumental and Noninstrumental Theories of Tort Law*, 88 Ind. L.J. 469, 469 (2013) (explaining that the Hand formula "essentially penalizes economically wasteful activity (the burden of taking a precaution that would have prevented the accidental injury to the victim, if the burden—that is, the cost—was less than the harm to the victim discounted—that is, multiplied-by the probability that such an accident would occur in the absence of the precaution), and, by thus making it more costly, tends to reduce, by deterrence, the amount of wasteful behavior in the future." (footnote omitted)).

None of this is to suggest our common law is or should always be explainable in law-and-economics terms, nor that courts should always run negligence and duty analyses through the Hand formula. Our case law deploys a variety of public policy prisms through which to analyze tort duties:

> Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing

future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties.

*Gariup Constr. Co. v. Foster*, 519 N.E.2d 1224, 1227 (Ind. 1988). The Hand formula simply provides a helpful theoretical framework for understanding our case law in this context.[2]

## IV.

In sum, I agree with the Court's application of the *Reece* rule here because it is consistent with the policy considerations underlying the rule. Obstructing traffic signs poses a danger comparable to obstructing the view of the road surface; the location of traffic signs within the right-of-way warrants different treatment from conditions located on exclusively private land; applying the duty here is only slightly more onerous than in *Reece*; and the rule remains easy to apply. A landowner owes a duty to passing motorists on an adjacent highway not to create hazardous conditions that visit themselves upon the roadway, and we consider as part of the roadway a public right-of-way containing a traffic control device; landowners do not owe a duty to the traveling public to prevent visual obstructions that are wholly contained on the landowner's property outside of any public right-of-way containing a traffic control device.

Rush, C.J., joins in Parts II–IV.

---

[2] Although I suggest only that the Hand formula is helpful for understanding the *Reece* rule, Justice Slaughter explains that applying the rule more broadly presents many questions. *Post*, at 9. I don't take issue with any of the answers he supplies, including that judges rather than juries decide the duty element, and experience shows common missteps that he explains well. *Id.*

**Slaughter, J., dissenting.**

I respectfully dissent. I would either deny transfer, letting the court of appeals' opinion stand, or affirm summary judgment for the landowner.

I

The plaintiff, Yerano Martinez, drove through a stop sign at a rural intersection and collided with another vehicle. Martinez sued the owner of land adjoining the intersection, Jeffrey Smith. He alleged Smith was negligent for allowing a bush on his property to grow into the county's easement alongside the road and obscure the stop sign. Smith sought summary judgment, relying on our recent decision in *Reece v. Tyson Fresh Meats, Inc.*, 173 N.E.3d 1031 (Ind. 2021), which held that a landowner's duty to the motoring public is to avoid creating "hazardous conditions that visit themselves upon the roadway." *Id*. at 1041 (quotation omitted). Martinez responded that *Reece* does not govern this case because the bush "was in the public right-of-way and 'visited' itself upon the adjacent roadway." The trial court sided with Smith and entered summary judgment in his favor.

On appeal, a unanimous appellate panel affirmed in a precedential opinion. It held that Smith owed Martinez no legal duty to prevent any visual obstruction because the disputed bush did not "extend into the roadway". *Martinez v. Smith*, 249 N.E.3d 1096, 1100 (Ind. Ct. App. 2024). Writing for the panel, Judge Weissmann reached this result after a thorough examination of our decision in *Reece* and the long line of precedent on which the *Reece* rule is based. Historically, she observed, Indiana case law on visual obstructions concerned only those hazards that invade the "traveled roadway." *Id.* at 1099 (collecting cases). Thus, the panel concluded, Smith "did not owe a duty of care to Martinez as a matter of law." *Id.* at 1100.

The Court today rejects the panel's thoughtful opinion. It grants transfer and reverses the trial court's judgment for the property owner based on what I believe to be stale case law, irrelevant dictionary definitions, and inapposite statutes. And in the process, it undermines *Reece*'s bright-

line rule. I am not persuaded *Reece* requires any modification or clarification.

## II

Five years ago, we brought order—or so I thought—to Indiana's disparate, common-law precedent about the legal duty landowners owe to passing motorists. *Reece*, 173 N.E.3d at 1032. *Reece* concerned "visual obstruction" cases where a motorist's view of the roadway is visually impaired by something on the landowner's property. "To clarify any confusion," *Reece* imposed a bright-line rule that "landowners owe a duty to passing motorists on adjacent highways not to create 'hazardous conditions that visit themselves upon the roadway'". *Id.* at 1034 (quoting *Sheley v. Cross*, 680 N.E.2d 10, 13 (Ind. Ct. App. 1997), trans. denied). Limiting the scope of this duty, we further stated that "there is no duty to the traveling public" when a visual obstruction is "wholly contained" on the land and thus not "visit[ing itself] upon the roadway". *Ibid.* (quoting *Sheley*, 680 N.E.2d at 13). In hindsight, we now learn that what *Reece* meant by "roadway" would be hotly contested. The Court today holds that term "encompasses not just the paved portion of the roadway but also traffic-control devices within the public right-of-way." *Ante*, at 2 (Goff., J.).

I respectfully disagree. In my view, a property owner's common-law duty extends only to the paved, traveled portion of the roadway, which is separate from the "public right-of-way". First, I explain the problems with the Court's opinion. Then, I briefly describe the comparative strength of the appellate panel's approach. Last, I respond to Justice Molter's separate opinion.

### A

I take issue with the Court's opinion in two respects. First, its holding and rationale find no support in our common law. Second, the Court tries to compensate for the lack of common-law support by resorting to misplaced dictionary and statutory authorities.

### 1

We announced our governing visual-obstruction rule in *Reece* only after "examin[ing] and synthesiz[ing] decades of caselaw to determine whether

the duty applies when a condition on the land imposes a visual obstruction but is confined to the land." 173 N.E.3d at 1032. One might have thought, given the work that went into deciding it, that *Reece* would be the starting point for today's case.

Yet the Court barely mentions *Reece* at all. The Court, rather, derives its understanding of our common-law visual-obstruction principles from three obscure court of appeals' opinions, the most recent of which is fifty years old. *Ante*, at 6 (citing *Indianapolis Water Co. v. Schoenemann*, 20 N.E.2d 671 (Ind. Ct. App. 1939); *Town of Ogden Dunes v. Wildermuth*, 235 N.E.2d 73 (Ind. Ct. App. 1968); *City of Evansville v. Follis*, 315 N.E.2d 724 (Ind. Ct. App. 1974)). That the Court could summon three appellate cases for its position is no surprise. Our stated goal in *Reece*, after all, was to resolve the "divergent answers" our appellate court had reached over many years. 173 N.E.3d at 1032. It is telling that none of these three cases merited discussion in *Reece*, prompting the question whether *Reece* overlooked important case law, or whether today's Court goes astray by citing these cases. I side with the latter.

Start with *Schoenemann*, which the Court adopts as its standard bearer. *Schoenemann* was a negligence action where a pedestrian "tripped over a curb box" containing utility fixtures. 20 N.E.2d at 673. Describing applicable law, the appellate court held, "It is a nuisance and unlawful to place and keep or leave continuously in a public highway anything which either impedes or endangers public travel." *Id.* at 677 (citation omitted). Then, using language the Court is swift to adopt, the appellate court explained that "[t]his rule applies to the whole width of the highway, and not merely to a worn portion of it commonly used for passage." *Ibid.* True enough, but *Schoenemann* concerned a physical impediment, a "curb box" covering water plugs or shut-off valves. 20 N.E.2d at 673. *Reece*, in contrast, "is confined to visual obstructions that do not come in contact with traveling motorists". 173 N.E.3d at 1041. Indeed, *Reece* "does not address situations where a motorist comes **in contact** with a condition that is wholly contained on the land." *Ibid.* (emphasis in original). The Court today does not explain how a rule relevant to physical impediments applies to our visual-obstruction case law.

The Court's other two appellate cases fare no better. *Wildermuth*, 235 N.E.2d 73, involved a town suing a landowner "to abate a nuisance" brought on by the landowner's "wooden fence approximately six feet within the right-of-way of a public street". *Id.* at 74. The issue was whether the encroaching fence was a "public nuisance", and thus removable, though "not within the traveled portion of the right-of-way". *Id.* at 76. The appellate panel held the fence was not a nuisance because "the view of persons operating motor vehicles on [the adjoining road] was not obscured", and "the fence did not force pedestrians" to share the road with "motor vehicles". *Ibid.* Today's case, in contrast to *Wildermuth*, has nothing to do with an actual or alleged nuisance. And *Wildermuth*'s concern over whether the fence was within the "traveled portion of the right-of-way", *ibid.*, contradicts the Court's view that the common-law duty extends to the **entire** right-of-way.

The Court's third case, *Follis*, 315 N.E.2d 724, is the least relevant. *Follis* asked whether the City of Evansville could enjoin construction of a "swimming pool and a surrounding brick wall" in a resident's backyard. 315 N.E.2d at 725. The case turned on whether the swimming pool and wall amounted to a "permissible encroachment" on the city's right-of-way. *Id.* at 727. In denying the injunction, the appellate panel relied on *Wildermuth* and noted that the disputed structures "did not obstruct the vision of persons driving along the street nor did [they] interfere with the public use thereof." *Ibid*. The Court ignores the distinction between a "permissible encroachment" necessary to defeat an injunction and a "dangerous hazard" implicated in a visual-obstruction case.

The Court says it is relying on these cases to define the meaning of "roadway" because *Reece* did not define it. *Ante*, at 7 n.4. The Court's unstated assumption is that the meaning of "roadway" in those cases must also govern here. Yet it is unclear why the term used a dozen times in *Reece* should derive its meaning not from the principles and precedents espoused there, but from the inapt *Schoenemann* case decided eighty-seven years ago.

To sum, the Court deviates from *Reece* by relying on three cases having nothing to do with motorists at all, much less motorists whose view was

obstructed by something on an adjoining owner's property. The Court cites these cases because, it says, they reveal that "[t]he common-law duty under *Reece* is not confined to the paved portion of the roadway." *Id.* at 6. These cases, in fact, reveal no such thing. If the goal is to discern the scope of the underlying common-law duty we announced in *Reece*, the least we should do is discuss *Reece* and the case law on which its rule was based. The Court does neither.

2

Recognizing the dearth of case law to support its result, the Court next explores what various dictionaries and statutes have to say about these issues. *Id.* at 7–8. In doing so, the Court assumes these other sources somehow inform or are relevant to the common-law rule we divined in *Reece* and apply here to guide the meaning—the "standard usage"—of "roadway". *Id.* at 8. This assumption is misplaced.

Dictionary definitions do not apply here. "The language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (cleaned up) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). If our case law includes an ambiguous term, we should interpret and clarify our underlying precedent in light of the principles on which the precedent was based—and not resort to dictionary definitions that may have nothing to do with the context in which our case law used the term. Might a dictionary definition of "roadway" include something beyond the street itself where the traveling public rides? Sure. Must the definition of "roadway" be limited to the street itself and not include peripheral property? Not necessarily. The issue, though, is not how broadly or narrowly one or more dictionaries may define this term, but what we meant in *Reece* when we pronounced our rule concerning the duty adjoining property owners owe to motorists for obstructions that do not "visit themselves upon the roadway". 173 N.E.3d at 1034. The answer to that question is sooner found in our precedent than in a dictionary.

The same is true of the Court's reliance on various statutes to discern the common-law meaning of "roadway". Throughout its opinion, *ante*, at 7–9, the Court considers what six statutes within Titles 8 and 9 of the

Indiana Code (dealing, respectively, with "Utilities and Transportation" and "Motor Vehicles") have to say about "common usage", *id.* at 7, or what the legislature "contemplated" through these laws, *id.* at 9. But the common law has never been about such things. Common law represents the "general principles that run through" our cases "and govern the decision of them." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 418–19 (2024) (Gorsuch, J., concurring) (citation and internal quotation marks omitted). Thus, even were the Court correct that "roadway" in these statutes means more than just a road's paved portion, it mistakenly interprets our common law based on statutory definitions.

Of course, the legislature is free to create its own regulatory standards and to impose legal consequences for breaching these standards. But it does not follow that the legislature's chosen path necessarily coincides with, or supersedes, our own path for addressing similar issues or problems. *Reece* said as much. There, we recognized the gulf between common law and statutes, stating that "our holding in no way prevents the General Assembly or local legislative bodies from enacting statutes or ordinances to impose a duty on landowners to refrain from creating or maintaining visual obstructions on land adjacent to highways in favor of the motoring public." *Reece*, 173 N.E.3d at 1041. We held only that "Indiana common law imposes no such duty." *Ibid.* That was then. Now, however, with today's about-face we tie the meaning of our common law to the meaning of statutes and, in the process, erode the important distinction between them.

B

Next, I prefer the court of appeals' analysis of this case to our own.

As the panel noted, *Reece* and the cases underpinning it "all contemplated a duty only where hazards existed on the **traveled roadway**." *Martinez*, 249 N.E.3d at 1099 (emphasis added) (collecting cases). The seminal example, which *Reece* formally adopted as the basis for its decision, is *Sheley v. Cross*, 680 N.E.2d 10. *Sheley* involved a claim that landowners had "negligently planted crops on their land such that a motorist's view of oncoming traffic at [an] intersection was impaired." *Id.* at 11. There, the court found no duty because the crop hazard did not "visit [itself] upon the roadway", *id.* at 13, and what *Sheley* meant by "roadway" is clear. It refers

to our reasoning in *Blake v. Dunn Farms, Inc.*, 413 N.E.2d 560 (Ind. 1980), that the property owner's duty is to prevent a "dangerous condition that visit[s] itself upon the **traveled portion** of the highway." *Sheley*, 680 N.E.2d at 13 (quoting *Blake*, 413 N.E.2d at 564) (emphasis added). The panel's holding below is that *Reece*, by relying on *Sheley*, was "impos[ing] a duty only on areas the traveling public uses, like roadways". *Martinez*, 249 N.E.3d at 1099.

Despite the court of appeals' unimpeachable application of *Reece*, the Court nevertheless extends Smith's legal duty beyond the roadway's "traveled portion" based not on *Reece* but our own definition of "road-way" wrenched from dubious sources—an outcome that does nothing but, as the panel noted, "obscure *Reece*'s bright-line rule." *Id.* at 1100.

C

Last, I address Justice Molter's separate opinion, which proposes a law-and-economics template for assessing whether courts should relieve a defendant (or a class of defendants) from an otherwise presumed duty under our tort law. This law-and-economics template, Justice Molter suggests, offers an alternative lens through which to adjudge our decision in *Reece*.

1

I share Justice Molter's view that law and economics can be a valuable tool for assessing many legal questions, including whether to impose a tort duty at all and, if so, with which party (or parties) any such duty should lie. I have written or joined opinions for our Court specifically adopting a law-and-economics approach in other areas of law. See, e.g., *Morehouse v. Dux North LLC*, 226 N.E.3d 758, 770 (Ind. 2024); *Town of Ellettsville v. DeSpirito*, 111 N.E.3d 987, 996-97 (Ind. 2018). And I generally think our case law across many topics would benefit from using such an approach more often. But it would be a stretch to say that we decided *Reece* on these grounds. Nowhere does our opinion say that.

We do not write on a blank slate here. *Reece* and the generations of precedent from which it derived should be the focus of this case. Thus, the answer to Justice Molter's rhetorical question "what [the] reason was", *ante*, at 6 (Molter, J., concurring), for *Reece*'s brightline rule is simple: it is

what our common-law precedent demanded. I understand that Justice Molter and my other colleagues believe that imposing a duty here is sound public policy. *Id.* at 6–8 (Molter, J.) (Part III); *ante*, at 10–11 (Goff, J.) (Part I.C). But, like the appellate panel below, I would resolve this case with a neutral application of *Reece* and our other visual-obstruction precedents.

These precedents do not condone "planting corn" or other vegetation "directly in front of stop signs", *Ante*, at 7 (Molter, J.), and that is not what happened here. Smith did not plant the offending bush in the public right-of-way. The bush was on his own property, and over time its foliage grew to obstruct the view of the traffic sign. That is no different from the corn in our "massive corn fields" that grows "tall enough to block the view of intersecting traffic." *Ibid*. From *Sheley*, the rule has always been that a landowner must refrain "from creating hazardous conditions that visit themselves upon the roadway." 680 N.E.2d at 13.

If the Court is right that "a stop sign, like any traffic-control device, is an integral part of the roadway", *ante*, at 6 (Goff, J.) (emphasis omitted), I would have expected the Court to conjure more than its own say-so for what it treats as a self-evident proposition. Yet until today, no visual-obstruction or other case law of which I am aware—and my colleagues cite none—holds that the right-of-way is part of the "roadway".

Despite my difference with Justice Molter on this point, I share his conceptual embrace of Judge Learned Hand's "algebraic expression of negligence liability". *Ante*, at 4 (Molter, J., concurring). Under the Hand formula (B < P x L), whether the defendant was negligent turns on three considerations: the cost to the defendant of preventing potential harm, the likelihood harm will occur without the defendant's intervention, and the severity of harm if it does occur. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947). This approach reflects a classic cost-benefit analysis for imposing tort liability. If the cost of preventing harm exceeds its benefit, then the defendant should not be liable for doing nothing. In other words, he is not "at fault" for his inaction and incurs no liability for the plaintiff's injury. The opposite is also true. If the cost to the defendant of preventing injury is modest in relation to the probability and severity of

injury, then the defendant should be liable for resulting injury he could have avoided but did not.

Justice Molter lays out these principles well in his separate opinion. *Ante,* at 4–6. But as the opinion notes, the Hand formula is about determining whether a defendant is negligent (for breaching a duty of care), *ibid.*; it is not about the antecedent question (at issue here) whether the defendant owes a duty at all. In this sense, Justice Molter conflates issues of duty and negligence (breach of duty) and leaves questions unanswered that will require further discussion in later cases.

Among the questions needing further development are broad issues of "who decides?". For example, I understand that Justice Molter's proposed law-and-economics approach would continue to assign judges and juries different tasks in tort cases: Judges decide duty; juries decide negligence. Yet other questions concern specific applications of the Hand rule. As noted, Hand is about negligence, which I assume is for juries to apply. But if Hand is also about duty, and thus for judges to apply, we must provide sufficient guidance to both judges and juries tasked with applying it. Our guidance must include notice of the very real risks that they will misapply it.

There are a few common ways to trip up in applying Hand. One is the risk of hindsight bias. The right way to apply Hand is to ask what precautions were reasonable **before** the accident occurred given known risks. What often happens, though, in practice—and it is human nature—is that the omniscient judge or jury knows the harm occurred and thus tends to overstate the risk of harm. After all, the risk of harm in every litigated case is 100%—the accident happened. Judges and juries also must be leery of efforts to manipulate (reverse engineer) Hand to attain a desired outcome. Another common error is that courts may rely too much on the formula. "Though mathematical in form, the Hand formula does not yield mathematically precise results in practice". *United States Fid. & Guar. Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1026 (7th Cir. 1982) (Posner, J.). Hand is not a "straitjacket" binding courts to its result; the formula merely reflects that "[t]he higher P and L are, and the lower B is, the likelier is a finding of negligence." *Ibid.*

These and other concerns demand that we provide sufficient guidance and guardrails for judges and juries who would apply Hand. Though I am onboard conceptually with this analytical tool, more details are warranted.

2

The other notable aspect of Justice Molter's separate opinion is how he sees the evolution of our tort case law over the last thirty-five years. He correctly observes that our decision in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), was about balancing various factors in deciding whether such a tort-law duty exists. *Ante*, at 2. But beginning with *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384 (Ind. 2016), continuing through *Reece*, 173 N.E.3d 1031, in 2021, and culminating with today's decision, he believes, we have "drifted" from asking whether there exists a tort-law duty to **presuming** such a duty exists and asking whether to **relieve** the defendant from this duty. *Ante*, at 2–3.

For starters, *Goodwin* does not say that. And relevant here, neither does *Reece*. Both opinions framed and analyzed the issue in terms of whether to "impose" a duty, not whether to relieve the defendant of a duty we presumed already existed. *Goodwin*, 62 N.E.3d at 394 ("We decline to impose such liability here."); *Reece*, 173 N.E.3d at 1041 ("We hold only that Indiana common law imposes no such duty."). Though I originally understood Justice Molter to be arguing for a wholesale change in our tort law that we have never adopted, *ante*, at 2, his separate opinion seeks to assure me that is not his aim. I am heartened to learn that he sees "[v]ery little, if any, daylight … between his view and mine". *Id.* at 3 n.1.

For now, it is enough to say that the question of how, precisely, to frame the issue of duty is not before us. But in a future case, with the benefit of further briefing, deliberation, and a full picture of its implications, I am open to being persuaded that Justice Molter's view would not represent a sweeping change in our tort law.

\*       \*       \*

Our court of appeals properly held that *Reece* imposes a duty on adjoining landowners only for obstructions that "exist[] on the roadway, i.e., the

area used by traveling motorists." *Martinez*, 249 N.E.3d at 1100. Because I agree with the appellate panel that no such duty is implicated here, I would deny transfer or summarily affirm the panel's opinion.

For these reasons, I respectfully dissent.